**N. Eric NAFTCHI, Plaintiff,**

v.

**NEW YORK UNIVERSITY, New York University Medical Center, Howard Rusk Institute of Rehabilitation Medicine, Saul J. Farber, David S. Scotch and Mathew H.M. Lee, Defendants.**

No. 96 CIV. 8116(LAK).

United States District Court, S.D. New York.

July 29, 1998.

Eric M. Nelson, New York City, for Plaintiff.

Michael Starr, Boris B. Thomas, Squadron, Ellenoff, Plesent & Sheinfeld, LLP, S. Andrew Schaffer, Ada Meloy, New York University Office of Legal Counsel, for Defendants.

### MEMORANDUM OPINION

KAPLAN, District Judge.

In this employment discrimination action, N. Eric Naftchi, Ph.D., a tenured professor of rehabilitation medicine at the New York University Medical Center ("NYUMC"), alleges that defendants, motivated by age animus, have deprived him of raises, laboratory space, office space, certain travel and office supply funds, and access to certain research funds, all in violation of the Age Discrimination in Employment Act (the "ADEA") and comparable state and local laws.[1] Dr. Naftchi argues also that some of these actions were taken in retaliation against him for filing a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC") and for filing this lawsuit. In addition to his disparate treatment and retaliation claims, Dr. Naftchi argues that defendants have a policy of conditioning certain benefits upon success in receiving research grants from the National Institutes of Health ("NIH") and that this policy has a disparate impact based on age. Finally, Dr. Naftchi asserts several state law claims including breach of contract, tortious interference with contractual relations, and tortious interference with prospective contractual relations.[2]

Defendants seek summary judgment dismissing Dr. Naftchi's claims. For the reasons stated below, defendants' motion is granted in part and denied in part.

### Background

Dr. Naftchi at all relevant times has been a faculty member in the Department of Rehabilitation Medicine ("DRM"), a part of the New York University School of Medicine (the "Medical School"). The defendants in this lawsuit are a number of institutions and individuals associated in various ways with the medical arm of defendant New York University ("NYU"), a private university chartered by the Regents of the State of New York and located in New York City. The NYUMC at all relevant times was an administrative unit of NYU,[3] and the Howard Rusk Institute of Rehabilitation Medicine ("Rusk Institute") was a subdivision of the NYUMC.[4] Among the researchers at the Rusk Institute were faculty members of the Medical School, another component of the NYUMC, including DRM members.[5]

---

1. 29 U.S.C. §§ 621 *et seq.;* N.Y. EXEC. L. § 296 ("NYSHRL"); N.Y.C. AD. C. § 8–107 ("NYCHRL").

2. Dr. Naftchi states in his declaration that he has withdrawn his claims based on national origin discrimination. Naftchi Decl. ¶ 4 n. 2. These claims therefore are dismissed.

3. Scotch Aff. ¶ 5.

4. *Id.;* Cpt. ¶ 2.

5. Scotch Aff. ¶¶ 5–7.

The three individual defendants each hold, or held, administrative positions within the Medical School. Saul J. Farber, M.D. is an 81-year old professor who served as Dean and Provost of the Medical School from 1986 until August 31, 1997.[6] David S. Scotch, M.D. is a 59-year old instructor who has served as Associate Dean of the Medical School since 1972.[7] Mathew H.M. Lee, M.D. is a 66-year old professor who has taught at the NYUMC since 1965 and served since 1986 as Acting Chairman for the DRM and as Medical Director of the Rusk Institute.[8]

The plaintiff, Dr. Naftchi, is a 69- or 70-year old[9] man who joined the faculty of the DRM as an associate professor in 1968[10] and was made head of a "laboratory of biochemical pharmacology" engaged in the investigation of spinal cord injuries.[11] In the ensuing years, he gained access to and control over several additional lab rooms and storage areas. In 1979, however, two of his laboratory rooms were taken away,[12] and a third laboratory was reallocated to other uses in 1980 or 1981.[13]

The first visible collision between Dr. Naftchi and the Medical School administration was precipitated by the August 1982 publication of an article in the journal *Science* by Dr. Naftchi describing his findings concerning the use of certain pharmaceuticals in the treatment of spinal trauma.[14] The article received considerable publicity and, apparently in response to that publicity, Dr. Farber[15] convened a panel of six members of the Medical School's faculty to evaluate the quality of Dr. Naftchi's research.[16] The panel's report, issued on October 12, 1982, concluded that "Dr. Naftchi's data do not support the conclusions reached in his paper in *Science* nor are they adequate to allow one to draw any conclusion whatsoever about the efficacy of clonidine in treatment of spinal trauma."[17]

After considering Dr. Naftchi's response to the panel's report,[18] Dr. Farber informed Dr. Naftchi of his decision to appoint "an appropriate outside committee ... to review this matter and to advise [him] with respect to the scientific and academic competence with which the research in question was conducted and any other matters upon which, after examination, the Committee feels obliged to comment."[19] Dr. Farber stated also that he would "instruct appropriate personnel that no further grant applications are to be approved for submission unless they are accompanied by a copy of the October 12th report, your response to it, and this letter."[20] It is not clear whether the outside consulting committee ever actually was formed,[21] and Dr. Farber's instructions regarding grant applications have not been in force since 1989.[22]

In 1983, in the wake of the *Science* incident, Dr. Naftchi lost control of three additional laboratory rooms, a storage room, and

6. *Id.* ¶ 3; Def. Ex. E, at 7, 9–11, 79, 90–92, 125 ("Farber Dep.").

7. Scotch Aff. ¶ 3.

8. Lee Aff. ¶¶ 1–2.

9. It is not clear whether Dr. Naftchi was born on March 25, 1928 or March 25, 1929. Def. Ex. G at 5–7 ("Naftchi Dep.").

10. *Id.* at 28.

11. *Id.*

12. Naftchi Decl. ¶ 6.

13. *Id.* ¶ 7.

14. *Id.* ¶ 9.

15. At the time, Dr. Farber was Acting Dean of the Medical Center. *Id.*

16. *Id.;* Def. Ex. Q at 1.

17. Def. Ex. Q at 2.

18. Def. Ex. R.

19. Def. Ex. S at 1.

20. *Id.*

21. Naftchi Decl. ¶ 11.

22. After Dr. Lee became the Acting Chairman in 1989, he met with Dr. Naftchi, learned that Dr. Naftchi believed that his grant applications still were subject to restrictions, and informed him that he "knew of no such restrictions and that, as far as [Dr. Lee] was concerned, [Dr. Naftchi] could and should apply for grants." Lee Aff. ¶¶ 6, 7.

a walk-in refrigerator/freezer.[23] An additional laboratory room was taken away in 1984.[24]

Several years later, in response to severe space shortages across the Medical School, the Dean formed a Research Space Committee for the Medical School (the "Space Committee") to "identify the least productively used and funded research space at NYU, with the added objective of finding from 20,000 to 30,000 square feet that might be better used by the University for other endeavors."[25] The Space Committee met with each department chairman to discuss the research being conducted in each laboratory, measuring the significance of that research in terms of federal funding.[26] Among the Space Committee's recommendations was the suggestion that the 7th and 8th floors of the Rusk Institute, at the time occupied by the DRM, be given to another department.[27] The Space Committee concluded also that since not all faculty displaced by the shifting of resources among departments could be given alternative space, such space should be allocated to faculty with outside funding.[28] For faculty without outside funding, "the policy of the Medical School ... was that if they obtained NIH or similar external grant funding for their research ... their circumstances would be re-evaluated, the priorities set by the Space Committee reassessed, and appropriate additional space allocated for each researcher as soon as practicable."[29]

In the midst of this space shortage, Dr. Naftchi found himself down to his final lab room. Despite this, in June 1991, Dr. Naftchi applied and was approved for an NIH grant.[30] In July 1991, however, Dr. Naftchi's final lab room was reallocated to another researcher whose research already had been funded.[31] Dr. Naftchi's NIH grant, although approved, never was funded.[32]

Later in 1991, Dr. Naftchi unsuccessfully requested new laboratory space in a letter to Dr. Farber.[33] Dr. Naftchi then requested a Grievance Committee.[34] The Grievance Committee Report, issued June 17, 1992, recommended

"that Dr. Naftchi be given a laboratory and a limited sum, we suggest about $30,000, toward supplies and technical help for a period of 2 years. This would permit him to obtain preliminary results so important for grant applications and would be beneficial to both the grievant and the Medical Center.... Dr. Naftchi should be encouraged to apply very quickly for grants. His performance should be reviewed at the end of this 2–year period. The future availability of laboratory space should be contingent on his obtaining a grant or at least priority scores within reach of funding. Significant publications in refereed journals should also be taken into account."[35]

In response to this recommendation, Dr. Scotch wrote to Dr. Naftchi, explaining that prior to providing him with scarce laboratory resources and internal funding, the Medical Center would require him to submit "a detailed proposal."[36] Dr. Naftchi submitted the requested proposal and budget in July 1992, but it was rejected on the ground that it "was essentially the same project Dr. Naftchi submitted previously to NIH and which subsequently was rejected by that agency."[37]

### The Events Underlying Dr. Naftchi's Remaining Allegations

Dr. Naftchi alleges that he was discriminated against on account of his age when he

23. Naftchi Decl. ¶ 12.

24. *Id.* ¶ 16.

25. Def. Ex. T at 7; Scotch Aff. ¶¶ 21–23.

26. Scotch Aff. ¶¶ 23–24.

27. *Id.* ¶ 25.

28. *Id.* ¶ 26.

29. *Id.* ¶ 28.

30. Naftchi Decl. ¶ 20.

31. *Id.* ¶ 21; Scotch Aff. ¶¶ 39–41.

32. Naftchi Decl. ¶ 21.

33. Def. Ex. KK.

34. Def. Ex. MM.

35. Def. Ex. NN at 2.

36. Def. Ex. OO.

37. Def. Ex. RR; Def. Ex. TT.

was denied salary increases for the years 1994 onward.[38] In addition, Dr. Naftchi complains of the loss or absence of various resources: In February of 1995, for example, Dr. Naftchi made verbal and written requests for the use of a vacant laboratory room, but these requests were not approved and he has remained without lab space at all times relevant to this suit.[39] In March 1995, Dr. Naftchi was transferred from his former office to a smaller one [40] and then, in October 1997, even this space was taken away.[41] In addition, Dr. Naftchi alleges that he has been denied "institutional support for professional travel, office supplies, and even a 'copy key' to use internal copying facilities." [42]

Dr. Naftchi contends also that defendants denied him access to research funds on account of his age and in violation of his contract rights.[43] Specifically, he argues that he has been denied access to the so-called Guggenheim Funds [44] despite his claim that at some point he had been promised that these funds would be utilized solely to support the research in which he and Dr. Edward Lowman were engaged and that these funds had been used for that purpose from their inception.[45] According to Dr. Scotch, the Guggenheim Funds are considered discretionary funds in that actual disbursements from the accounts are within the discretion of the chairman of the DRM and, since 1993, the funds have been insufficient to pay for anything beyond Dr. Naftchi's salary and related overhead expenditures.[46]

Dr. Naftchi's allegation of unlawful retaliation arises out of his June 26, 1995 charge of age and national origin discrimination with the EEOC, as well as the filing of this lawsuit in 1996.[47] The EEOC charge complained that "[Dr. Naftchi had] been denied raises, had [his] job performance criticized and on March 9, 1995, [he] was removed from [his] office and reassigned to a smaller office by the Acting Chairman of the Rehabilitation Medicine Department" and, further, that he did not have a lab.[48] In his affidavit accompanying the charge, Dr. Naftchi declared his belief that he was being discriminated against because of his age because his "employer would like to get rid of older people with high salaries." [49] On July 30, 1996, the EEOC rejected Dr. Naftchi's claims.[50] Specifically, the EEOC determined that "review of the evidence in your case ... fails to indicate that a violation has occurred and it is not likely that additional information will result in our finding a violation." [51]

### Discussion

#### The ADEA Claims

1. Disparate Treatment

a. Basic Principles

Under the ADEA, an employer may not discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment nor otherwise adversely affect the employee's job status on

---

38. In an order dated June 2, 1997, the Court dismissed Dr. Naftchi's federal discrimination claim to the extent that it sought relief for events that occurred prior to August 30, 1994, based on a statute of limitations period of 300 days from the date of the unlawful employment practice. The Court left open the question of whether the proper limitations period is 180 rather than 300 days.

Dr. Naftchi alleges also that he received a substandard salary increase in 1993. As that decision was made in 1992, however, any relief for his salary in that year is barred. See Def. Ex. TT; Scotch Aff. ¶ 66.

39. Naftchi Decl. ¶¶ 30–31.

40. Id. ¶ 32.

41. Id. ¶¶ 37–38.

42. Id. ¶ 33.

43. Id. ¶ 44

44. The Guggenheim Funds are endowment accounts established at NYU in the late 1960's and early 1970's to support research at the Rusk Institute and the DRM. Scotch Aff. ¶ 29.

45. Naftchi Decl. ¶¶ 41, 42.

46. Scotch Aff. ¶¶ 30, 31.

47. Naftchi Decl. ¶ 34.

48. Def. Ex. QQQ.

49. Def. Ex. RRR at 1.

50. Def. Ex. SSS.

51. Id. at 1.

the basis of the employee's age.[52] The ADEA does not, however, prohibit employers from taking such actions where the decision is based on "reasonable factors other than age."[53]

In *McDonnell Douglas Corp. v. Green*,[54] the Supreme Court set forth the "allocation of the burden of production and an order for the presentation of proof" applicable to Title VII cases, and this formulation is applicable as well to cases under the ADEA and the comparable New York laws.[55] Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case.[56] In the context of Dr. Naftchi's claims, this burden is satisfied if he can show (1) membership in the protected age group, (2) qualification for the benefits he sought, (3) and an adverse employment action concerning those benefits that (4) occurred in circumstances giving rise to an inference of discrimination based on the plaintiff's membership in the protected class.[57] The plaintiff's burden in establishing the *prima facie* case is "minimal."[58]

Establishment of the *prima face* case generates a presumption that the employer engaged in unlawful discrimination.[59] The plaintiff at that point is entitled to proceed to the jury unless the defendant "comes forward with a non-discriminatory reason for the action complained of."[60] Articulation of a legitimate, non-discriminatory reason rebuts the presumption created by the *prima facie* showing, leaving only the ultimate question of whether the plaintiff has proved intentional discrimination.[61] In order to establish intentional discrimination, the plaintiff must prove that (1) the legitimate, non-discriminatory reason proffered by the defendant is pretextual, or false, and (2) the actual reason for the decision was age discrimination.[62] Notably, a finding of pretext does not necessarily require a finding of discrimination.[63] This is so because

> "discrimination does not lurk behind every inaccurate statement. Individual decision-makers may intentionally dissemble in order to hide a reason that is non-discriminatory but unbecoming or small-minded, such as back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility."[64]

The Court considers Dr. Naftchi's disparate treatment claim with these considerations in mind.

**52.** 29 U.S.C. § 623(a)(1) and (2).

**53.** *Id.* § 623(f)(1).

The NYSHRL and NYCHRL prohibit the same conduct but do not limit the protected class to those over 40. N.Y. EXEC. L. § 296, subd. 1(a); N.Y.C. AD. C. § 8–107(1)(a).

**54.** 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**55.** *See Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997) (in banc), *cert. denied*, —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998) (ADEA); *Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir.1997) (N.Y.EXEC.L. § 296); *O'Malley v. AIDS Institute*, No. 95 Civ. 5561(PKL), 1996 WL 447748, at *4 (S.D.N.Y. Aug.7, 1996) (N.Y.C.A.D.C. § 8–107).

The *McDonnell Douglas* approach, of course, is not the only means by which a plaintiff can demonstrate age discrimination. Direct evidence of age animus, such as a statement by an employer that an employee was fired because of his age, is another. *See, e.g., Rosen v. Thornburgh*, 928 F.2d 528, 532 (2d Cir.1991). Apart from certain statements by Dr. Scotch, which are discussed below, Dr. Naftchi has no such direct evidence.

**56.** *Fisher*, 114 F.3d at 1335. .

**57.** *Norton v. Sam's Club*, 145 F.3d 114, 116 (2d Cir.1998) (discharge); *Fisher*, 114 F.3d at 1335; *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994); *Maresco v. Evans Chemetics*, 964 F.2d 106, 110–11 (2d Cir.1992).

**58.** *Fisher*, 114 F.3d at 1335 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); *see also id.* at 1340 n. 7 (collecting cases).

**59.** *Id.* at 1335 (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

**60.** *Id.*

**61.** *Id.* at 1336.

**62.** *Id.* at 1337, 1339.

**63.** *Id.* at 1337–38.

**64.** *Id.* at 1337.

### b. The Prima Facie Case

Dr. Naftchi is a member of the class protected by the ADEA, as he was over the age of forty at all times relevant to this dispute. He has established genuine issues of material fact as to the existence of adverse employment actions. The first and third prongs of his *prima facie* case therefore are satisfied.

In contrast, there is considerable dispute concerning the second and fourth prongs of Dr. Naftchi's *prima face* case: whether he was qualified for the benefits he sought and, if so, whether their denial occurred in circumstances giving rise to an inference of discrimination. In determining whether Dr. Naftchi has satisfied these requirements, however, the Court must consider also whether the defendants' counterarguments are more properly addressed at the later stages of the *McDonnell Douglas* analysis.

In *Powell v. Syracuse University*,[65] the Second Circuit warned that courts must be careful not to "unnecessarily collapse[ ] the steps suggested by *McDonnell Douglas* by shifting considerations which are more appropriate to the employer's rebuttal phase to the earlier requirement that the employee demonstrate competence to perform the specified work."[66] Applying this rule, *Powell* specifically rejected the proposition that the qualification test, in the case of a plaintiff who had not been reappointed to a prior position, should "requir[e] the employee to prove not merely that he possesses the basic skills necessary for the job, but rather that he is the best-qualified candidate for the job, under the criteria suggested by the employer."[67] Instead, *Powell* found that the correct standard simply was whether the plaintiff had come forward with evidence of satisfactory job performance.[68]

*Powell*'s strict enforcement of the boundaries between the stages of the *McDonnell Douglas* was called into question by the Second Circuit's subsequent decision in *Lieberman v. Gant*.[69] Judge Friendly there held for the Court that the *Powell* standard of satisfactory performance was not an appropriate measure of the qualification requirement where the plaintiff complained not that he had lost his job, but that he was not given tenure.[70] Significantly, Judge Friendly explicitly relied on the employer's policy in concluding that there is a considerable difference in the qualifications for maintaining one's job and for obtaining the tenure, and that this difference should be reflected in a higher standard in the latter case.[71] *Lieberman* thus stands for the sensible propositions that there is no "one-size-fits-all" qualification standard and that the qualification standard instead must be tailored in some fashion to the nature of the employment action involved.

That *Lieberman*'s tailoring principle requires reference to the employer's criteria was made plain in *Thornley v. Penton Publishing, Inc.*,[72] where the Circuit stated that

> "a plaintiff complaining of discriminatory discharge shows 'qualification' by demonstrating satisfactory job performance, in accordance with the particular employer's criteria for satisfactory performance. We adhere to the position that a plaintiff must satisfy the employer's honestly-held expectations."[73]

Both *Lieberman* and *Thornley*, however, are in some tension with *Powell*'s injunction

---

**65.** 580 F.2d 1150 (2d Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978).

**66.** *Id.* at 1155; *but see Hall v. Daka Intern., Inc.*, 949 F.Supp. 969, 974 (N.D.N.Y.1996) ("the analysis of whether an employee is 'qualified' under the *McDonnell Douglas* test often folds into the analysis of whether the employer had a nondiscriminatory reason to [take the adverse employment action.]"); *Farber v. Arrow Co.*, No. 82 Civ. 7563(JFK), 1985 WL 1076, at *3 (S.D.N.Y. Apr.29, 1985) ("The second and third steps of the *McDonnell Douglas* test collapse into the dispute as to whether a prima facie case was established . . . .")

**67.** 580 F.2d at 1155.

**68.** *Id.*

**69.** 630 F.2d 60 (2d Cir.1980).

**70.** *Id.* at 64.

**71.** *Id.*

**72.** 104 F.3d 26 (2d Cir.1997).

**73.** *Id.* at 30.

against collapsing the stages of the *McDonnell Douglas* analysis.

Dr. Naftchi's case evokes this tension. *Lieberman* suggests, and *Thornley* confirms, that the Court should consider NYU's policies in regard to the benefits sought by Dr. Naftchi in determining whether he was qualified. The problem with doing this is that Dr. Naftchi claims that these criteria are pretextual and that the real criterion in each instance is youth. In other words, consideration of the qualification issue necessarily implicates the subsequent stages of the *McDonnell Douglas* analysis, in apparent contravention of *Powell.*

Resolution of this tension among *Lieberman, Thornley,* and *Powell* fortunately is unnecessary in this case. Defendants have articulated non-discriminatory explanations for their decisions.[74] By thus satisfying the burden applicable once a *McDonnell Douglas prima facie* case is made out, they remove the presumption that would flow from the *prima facie* case and place upon Dr. Naftchi the burden of coming forward with evidence creating a triable issue of fact on the ultimate issue of discrimination. Seen in this light, and considering the *de minimis* nature of the showing required at the *prima facie* stage, the Court assumes that Dr. Naftchi has adduced sufficient evidence to make out each of the elements of his *prima facie* case for purposes of this motion. The Court therefore proceeds to determine whether Dr. Naftchi has demonstrated the existence of a triable issue of fact on the ultimate issue of discrimination.

### c. Allocation of Laboratory and Office Space

■ The Medical School administration's stated reason for refusing to give laboratory space to Dr. Naftchi and for first reducing and later eliminating his office space is that Dr. Naftchi does not have external and, in particular, federal funding and thus is not a productive member of the faculty.[75] Dr. Naftchi does not deny that he lacks federal funding.[76] Instead, he argues first that he is productive nonetheless by publishing articles and participating in conferences.[77] Whether he is or is not productive in that sense is not the Court's concern, however, as it is defendants' prerogative to establish the criteria by which this determination shall be made. The law is concerned not with whether the Medical School administration's criteria are wise, only whether they are non-discriminatory.[78]

In his second, and more relevant, argument, Dr. Naftchi contends that the focus on federal funding is a pretext and that lab and office space actually is allocated on the basis of age animus. The Court's task is to determine whether there are triable issues of fact supporting these arguments. There are not.

Considerable emphasis is placed by plaintiff on the statement of Dr. Scotch that "[i]n

---

74. These explanations are explored in detail below.

75. *See, e.g.,* Scotch Aff. ¶ 50 ("[B]y the early 1990's, it was the common practice of all departments throughout the School *not* to give lab space to tenured faculty who could not, through their own outside funding, cover overhead and administrative expenses."); *id.* ¶ 53 ("The only factor considered in the Dean's Office for [the decision to give the entire 7th floor of the Rusk Institute to the Department of Cell Biology's Dr. Dan Rifkin] was the best utilization of research space as between School departments based on the amount of federal funding."); *id.* ¶¶ 54–56 ("As part of our ongoing effort to reallocate space to best serve the needs and priorities of the Medical Center, the 8th floor of the [Rusk Institute] (where Dr. Naftchi's office is currently located) is being cleared for use by NYMC's Cancer Center. As a result we expect that Dr. Naftchi's present office, room 812A, will shortly be reassigned for that institutional priority.")

76. Dr. Naftchi has neither received nor even applied for any research grants since the NIH decided not to fund his 1991 grant application. Naftchi Dep. at 236–40. *See also* Lee Aff. ¶ 26 ("Dr. Naftchi had no external grants since at least 1989. Therefore, research expenses for him had to come from the Guggenheim Funds [which are discretionary funds], subject to [Dr. Lee's] approval.")

77. Dr. Naftchi asserts, for example, that he wrote several articles in 1995, that he has participated in 29 conferences, colloquia, or other gatherings since 1991, and that he serves as a journal editor and grant reviewer for various organizations within his field. Naftchi Decl. ¶¶ 36, 53, 89–90.

78. *See DeMarco v. Holy Cross High School,* 4 F.3d 166, 170–71 (2d Cir.1993); *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir.1988).

order to be competitive, [the Cancer Center, to which were allocated labs that had been used by the DRM,] needed to be able to recruit young, productive faculty members who had grants," and that such young faculty members "will be competitive in obtaining National Institutes of Health grants."[79] Dr. Naftchi suggests that this is a smoking gun revealing age animus in the space allocation process. Plaintiff, however, misconceives Dr. Scotch's statement. What it reveals is not a preference for youth, but a preference for external sources of funding. The clear import of the statement is that lab space is being allocated with the goal of increasing the amount of external research funding, a reasonable, non-age-related factor for a research institution to consider, particularly in times of scarce funding.

■ That Dr. Scotch's statement betrays an awareness that the awarding of federal grants may be correlated inversely with age may have some bearing on Dr. Naftchi's disparate impact claim, but it does not tend to prove that the real reason for lab allocation decisions at the NYUMC is age animus. The Supreme Court, in *Hazen Paper Co. v. Biggins*,[80] "made clear that employment decisions driven by factors that are empirically intertwined with age are not discriminatory so long as they are motivated by 'some feature other than the employee's age.'"[81] Applying *Hazen* in the context of an airline's policy of not using a seniority system to hire pilots for a new shuttle system, the Second Circuit in *Criley v. Delta Air Lines, Inc.*[82] concluded that the policy did not violate the ADEA.[83] The Circuit reasoned that, despite several statements including references to age, it was apparent that the airline was motivated not by "ageist intent" or by "assumptions about employees' abilities based on their age" but rather by "a concern about the economics of hiring pilots who were approaching the mandatory retirement age."[84]

Dr. Scotch's comments are similar to those made by Delta. It is undisputed that funding for research is scarce and that NIH grants have become one of if not the most important source of funds available. It is undisputed also that a research institution such as the NYUMC depends to a large extent on its access, via its individual faculty, to such funding. As in *Criley*, the comments of Dr. Scotch "express considerations of the business effects of the" federal grant award process and "not assumptions about [faculty members] based on their age."[85]

Dr. Naftchi's other evidence is similarly unavailing. He contends, for example, that several of the laboratory spaces taken from him eventually were given to other, younger faculty.[86] There is no suggestion that such allocations were inconsistent with the policy of allocating space to the most productive faculty. Moreover, these incidents all took place in the 1980's;[87] relief for them is barred by the statute of limitations. At most, they add to the background against which the Court assesses defendants' actions within the limitations period.

The only incident within the limitations period to which Dr. Naftchi points is the denial of his 1995 request for lab room 720.[88] According to plaintiff, although this room was not in use, his request for access to it never was granted.[89] Assuming this to be true, however, there is no basis for a reasonable person to conclude that age played any role in the decision. The room had not been allocated to a younger doctor. Instead, lab room 720 was being held for use by Dr.

79. Scotch Dep., Nelson Decl. Ex 6, at 157, 159 ("Scotch Dep.").

80. 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).

81. *Criley v. Delta Air Lines, Inc.*, 119 F.3d 102, 105 (2d Cir.), *cert. denied,* — U.S. —, 118 S.Ct. 626, 139 L.Ed.2d 607 (1997) (quoting *Hazen*, 507 U.S. at 609, 113 S.Ct. 1701).

82. *Id.*

83. *Id.*

84. *Id.*

85. *Id.*

86. Naftchi Decl. ¶¶ 13, 14, 16.

87. *Id.*

88. *Id.* ¶ 30.

89. *Id.* ¶¶ 30, 31.

Arthur Eberstein,[90] who is the same age as Dr. Naftchi.[91] In any event, the entire 7th floor of the Rusk Institute, including lab room 720, subsequently was allocated from the DRM to the Department of Cell Biology.[92]

Finally, Dr. Naftchi contends that defendants' explanation is shown to be pretextual by the fact that Drs. Lee and Eberstein have not received any grant funding for the past ten and eight years, respectively, and yet have not had their labs taken away.[93] The problem is that these two doctors are each of similar age to Dr. Naftchi: Dr. Eberstein is Dr. Naftchi's age[94] while Dr. Lee is at most four years younger.[95] Thus, even if this evidence does tend to show pretext, it does not suggest that the actual motivation behind space allocation decisions is age animus. On the contrary, this evidence tends to rebut that argument.

Put another way, this evidence may create a triable issue of fact concerning whether defendants' explanation for its space allocation decisions is pretextual, but it does not follow that there is a triable issue of fact concerning the ultimate question of whether defendants were motivated by age discrimination. While a showing of pretext may contribute to a finding of discriminatory motivation,[96] this is not so where, as here, the sole evidentiary basis for questioning the veracity of defendants' explanation tends to show also that defendants were not motivated by discriminatory animus. The in banc Second Circuit recently explained:

> "a defendant's false statements are nothing more than pieces of circumstantial evidence which may be employed, as in many other types of cases, to reveal the speaker's state of mind. To the extent that an actor in defendant's position is unlikely to have proffered a false explanation except to conceal a discriminatory motive, then the false explanation will be powerful evi-

dence of discrimination. On the other hand, if the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent. And if, on examination of the circumstances, there are many possible reasons for the false explanation, stated or unstated, and illegal discrimination is no more likely a reason than others, then the pretext gives minimal support to plaintiff's claim of discrimination." [97]

Remarkably, Dr. Naftchi's evidence of pretext, that Drs. Eberstein and Lee have not lost their labs despite lacking external funding, does not actually fall within any of the categories discussed in *Fisher*, but instead falls within a fourth category in which the plaintiff's evidence of pretext tends to disprove both the defendant's articulated reason and the plaintiff's allegation of age discrimination. Rare as cases of this type may be, it is incontrovertible that this type of pretext evidence provides no support for allegations of discriminatory motivation and hence no defense to summary judgment.

As plaintiff has failed to establish a triable issue of fact on the issue of the Medical School administration's discriminatory intent, summary judgment is granted as to the decisions not to give Dr. Naftchi lab space and to reduce and then eliminate his office space.

### d. Raises

■ Dr. Naftchi contends that defendants' decisions to deny him raises since 1994 were motivated by age discrimination. Defendants respond that raises are based on merit alone, as determined by the relevant department chairman, and that Dr. Naftchi's level of productivity during the relevant period has not warranted a raise. The question for the Court is whether there are triable issues of fact concerning whether defendants' explanation is true and, if not, whether age dis-

---

90. Scotch Aff. ¶ 49.

91. Naftchi Decl. ¶ 78

92. Scotch Aff. ¶¶ 50, 52.

93. Pl. Br. at 9–10.

94. Naftchi Decl. ¶ 78.

95. Lee Aff. ¶ 2.

96. *Fisher,* 114 F.3d at 1337–38.

97. *Id.* at 1338.

crimination was the actual motivation. Again, there are not.

According to defendants, "NYU does not have a 'standard' or 'automatic' or 'cost-of-living' increase at all for its tenured Medical Center faculty, and has not for some time." [98] Instead, raises are awarded on a merit basis, depending on factors such as "productivity, department and school contributions, and general performance ... as judged by his or her department chairman." [99] The only limitation upon the chairman's discretion comes from the "Salary Increase Program" ("SIP") for NYUMC faculty, which is established annually by the Dean in consultation with other administrators.[100] The SIP provides department chairmen with discretion to determine raises, subject to the constraint that the aggregate raise for the department cannot exceed a stated percentage that has ranged over time from two to six percent.[101] The 1993 SIP, controlling raises for the year 1994, provided that no raises were to be given to employees who did "not meet minimum performance goals or job requirements." [102] Similar instructions were provided in the ensuing years.[103]

Dr. Lee, as Acting Chairman of the DRM, had the discretion to determine the raises to be given, if any, to Dr. Naftchi during the relevant time period.[104] Dr. Lee states that he measured individual performance "primarily on whether the faculty member has external grants or other external funding for their research. Other factors are considered, including the number of publications put out by each faculty member during the prior year, the value of the research projects being undertaken, and the funding available to the faculty member relative to the amount of money in the Department's budget that I have at my disposal." [105]

Dr. Naftchi begins by challenging the merit of using success in acquiring grants as a basis for awarding salary increases or otherwise assessing merit,[106] arguing that background, tenure, experience, length of service, scholarship, and past contributions should be considered.[107] As noted previously, however, it simply is not the Court's function to assess the wisdom of defendants' criteria.[108]

Next, Dr. Naftchi attempts to demonstrate that defendants' explanation for their salary decisions is pretextual. He points to the statement of Dean Farber that individual faculty members' access to grant funds is not taken into account when formulating a given department's salary budget.[109] It does not follow, however, that an individual faculty member's access to grant funds plays no role in determining how the salary budget is dis-

---

98. Scotch Aff. ¶ 65.

99. *Id.*

100. *Id.* ¶ 66.

101. *Id.*

102. Def. Ex. XX at 2.

103. Scotch Aff. ¶ 67.

104. Lee Aff. ¶ 4.

105. *Id.* ¶ 5.
 Dr. Lee explains further, in reference to the decision to deny a raise in 1993, that "[b]ecause the Department's discretionary funds had declined significantly—to the point that the Department was facing negative cash flow for the first time—I decided that salary increases would not be given to faculty members who already were receiving all their salary from the Department's Discretionary Funds [such as Dr. Naftchi]." *Id.* ¶ 16. Prior to denying him a raise, however, Dr. Lee solicited information from Dr. Naftchi concerning his publication and research activity.

Def. Ex. ZZ. Dr. Naftchi responded with a description of numerous conferences in which he had participated, eleven articles published from 1988 until 1991, and twelve manuscripts for future publications. Def. Ex. AAA. Dr. Lee asserts that he never learned whether any of these manuscripts were published. Lee Aff. ¶¶ 18, 19.

106. Dr. Naftchi points to the testimony of Dr. Eric Simon, who testified that one could "be very good and not have a grant. It's that competitive." Nelson Decl. Ex. 7, at 38. If anything, however, Dr. Simon's statement corroborates defendants' contention that it has become necessary, in order to keep the federal dollars flowing, for the NYUMC to take all steps available to accommodate those faculty members who do have federal funding, even if this occurs at the expense of those who do not.

107. Pl. Br. at 5.

108. *See DeMarco*, 4 F.3d at 170–71; *Dister*, 859 F.2d at 1116.

109. Nelson Decl. Ex. 3, at 420.

tributed among individual faculty members within a department. Consistent with this point, Dean Farber went on to explain that the salary of an individual faculty member is determined by his or her department chairman alone.[110]

Dr. Naftchi points also to the fact that Dr. Eberstein has received no grant funding since 1990 and yet received raises during that time period.[111] Dr. Eberstein is not simply another faculty member, however, but the DRM's Director of Research. In any event, as noted previously in the context of space allocation decisions, Dr. Eberstein is approximately Dr. Naftchi's age. Thus, any inference to be drawn from salary discrepancies between these two faculty members could have nothing to do with age animus.

Plaintiff argues next that the falsity of defendants' explanation is revealed by the fact that Dr. Lee has not had grant funding in recent years and yet has received raises. Once more, however, Dr. Naftchi's argument founders on the fact that Dr. Lee is of a similar age to Dr. Naftchi, eliminating any inference that age played a role in any disparate treatment that may have existed. Furthermore, Dr. Lee's position as Acting Dean and that position's corresponding administrative burdens provide an uncontested explanation for the variation in salary treatment.

Dr. Naftchi argues also that defendants' discriminatory intent is revealed by a comparison between his salary and the salaries of other professors at the Medical School of the same rank (full professor), final degree (Ph. D.), and gender (male), as revealed by a 1996 Medical School report.[112] Specifically, Dr. Naftchi points out that his salary of $82,705 was well below the average Medical School salary of $115,645.[113] There are several problems, however, with relying upon this statistical comparison. First and foremost, these statistics do not even purport to account for age. Second, the report does not account for length of service or any number of other potential causal factors. Third, the comparison of Dr. Naftchi to the entire faculty of the Medical School overlooks differences between departments. Finally, when age is taken into account, a comparison of Dr. Naftchi's salary to that of other Ph.D.'s in his own department for the years 1994, 1995, and 1996 does not provide any support for an inference of age discrimination:

| Salaries of Ph.D. Faculty Members of Department of Rehabilitation Medicine | | | | | | | |
|---|---|---|---|---|---|---|---|
| Identification | Birth Date | 1994 Salary | Raise vs. prior yr. (%) | 1995 Salary | Raise vs. prior yr. (%) | 1996 Salary | Raise vs. prior yr. (%) |
| 111 | 1919 | $23,997 | 0 | $23,997 | 0 | $23,997 | 0 |
| 106 | 1924 | $106,171 | 6 | $106,171 | 0 | $107,232 | 1 |
| 104 | 1928 | $95,117 | 3 | $95,117 | 0 | $95,118 | 0 |
| Naftchi | 1928 or 1929 | $82,705 | 0 | $82,705 | 0 | $82,705 | 0 |
| 116 | 1932 | $43,351 | 3 | $43,350 | 0 | $44,217 | 2 |
| 110 | 1933 | $77,326 | 3 | $77,326 | 0 | $78,873 | 2 |
| 112 | 1943 | $54,625 | 6 | n/a | n/a | $55,717 | n/a |
| 113 | 1949 | $54,590 | 10 | $55,135 | 1 | $56,239 | 2 |
| 105 | 1951 | $57,711 | 0 | $1,500 | –97 | $1,500 | 0 |

This chart reveals that plaintiff was paid more than any of his younger colleagues, that in 1994 both a younger and an older colleague did not receive raises, that virtually no one got a raise in 1995, and that the few raises awarded in 1996 did not exceed two percent. In addition, two older faculty mem-

---

**110.** *Id.*

**111.** Nelson Decl. Ex. 2 at 33 ("Eberstein Dep.").

**112.** Nelson Decl. Ex. 10.

**113.** *Id.*

bers earned even more than Dr. Naftchi. These statistics militate against any inference that defendants' salary decisions are motivated by age.

In summary, Dr. Naftchi has failed to come forward with evidence supporting his contention that age discrimination motivated defendants' salary decisions. The fact that Drs. Eberstein and Lee have received some raises in the absence of grant funding might support an inference that defendants' did not in fact premise their salary decisions solely upon access to grant funding. As noted previously, however, the similarity in age between Drs. Lee, Eberstein, and Naftchi runs entirely counter to the argument that age rather than outside funding is the genuine motivating factor. Hence, any inference of pretext flowing from this evidence contributes not at all to plaintiff's ultimate burden of coming forward with evidence of discrimination. Furthermore, Dr. Naftchi has not called into question defendants' explanation that Drs. Lee and Eberstein are entitled to different salary treatment because they, unlike he, serve as administrators. Finally, plaintiff's focus on funding fails to account for defendants' explanation that not only grant funding but also other productivity factors such as publications play a role in salary decisions. As Dr. Naftchi has failed to come forward with evidence of age discrimination in defendants' salary decisions, summary judgment is granted on this point.

### e. Miscellaneous Expenses and Access to the Guggenheim Funds

■ Having already rejected Dr. Naftchi's claims that he was denied lab space and raises on account of his age, the Court is not detained long in considering his claim that age discrimination motivated defendants' decisions concerning miscellaneous office and travel expenses and access to the Guggenheim Funds. Dr. Naftchi's assertion that such expenses were denied to him but were provided to other, younger faculty is not supported by evidence. Dr. Lee testified that it is the DRM's policy, assuming money is available, to limit expenses-paid travel to one trip each for the department chairman and vice-chairman.[114] In addition, on rare occasions the chairman would approve a specific proposal for expenses-paid travel.[115] Dr. Lee testified that he recalled only one such occasion,[116] and Dr. Scotch conceded that a faculty member from another department once was provided funding from the dean's office on a special occasion.[117] Aside from pointing to these admissions that some faculty travel is paid for in rare instances, Dr. Naftchi has come forward with no evidence that suggests that travel funding decisions are influenced by age animus, and these admissions are insufficient to generate a triable issue of fact on the question of age animus.

■ Nor has he come forward with evidence that office expense decisions were influenced by the ages of faculty members. Dr. Scotch testified that most faculty pay for office supplies out of grant and other external funds.[118] Otherwise, the department chairman has discretion to provide funds or not. Dr. Scotch recalled only one occasion on which the Dean's office paid for a faculty member's office supplies.[119] Standing against this evidence is Dr. Naftchi's naked assertion that various younger faculty members were treated differently, which simply is not, without more, probative of age discrimination.[120]

■ Finally, there is no evidence that would tend to prove that denial of access to

114. Lee Dep. at 534–36.

115. Id.

116. Id. at 535–36.

117. Scotch Dep. at 416–18.

118. Id. at 419.

119. Dr. Scotch explained that the Dean's office had agreed, as part of the compensation package for that particular faculty member, to pay for those office supplies. Id. at 420.

120. Naftchi Decl. ¶ 33 ("I was denied institutional support for professional travel, office supplies, and even a 'copy key' to use internal copying facilities, while younger faculty such as Francois Haas, Kenneth Axen, Kalman Rubinson, Ned Richter and Martin Nachbar, several of whom were not even tenured, were provided with them.")

the Guggenheim Funds was motivated by age animus. Defendants explain that the distribution of these funds is within the sole discretion of the chairman of the DRM and that the funds have been insufficient since 1993 "to support any research costs except Dr. Naftchi's own salary (and fringe benefits) and related overhead charges."[121] Any claim that Dr. Naftchi may have in relation to the Guggenheim Funds is in the nature of a contract or tortious interference claim rather than a claim of discrimination.

Having found that Dr. Naftchi has failed to come forward with evidence creating a triable issue of fact on the question of whether age discrimination motivated any of defendants' decisions, the Court grants summary judgment dismissing Dr. Naftchi's claim of disparate treatment under the ADEA.[122]

*2. Disparate Impact*

▪ Dr. Naftchi's reliance on the disparate impact doctrine in order to establish that defendants' salary and lab space allocation decisions violated the ADEA is ill-fated as well.

In the context of defendants' salary decisions, plaintiff's disparate impact claim attacks a policy pursuant to which raises are allocated within individual departments, by the department chairmen, on the basis of individual performance.[123] In Dr. Naftchi's department, individual performance in turn is measured primarily with reference to whether a faculty member has external research funding, though other considerations such as publications and the value of current research are considered also.[124] In the context of defendants' lab space allocation decisions, plaintiff's disparate impact claim attacks a policy pursuant to which lab space is allocated among faculty throughout the Medical School on the basis of each faculty member's access to external and, particularly, federal funding.[125]

Plaintiff's disparate impact claims simply are not supported by relevant evidence. Dr. Naftchi apparently focuses on the fact that defendants' lab space and, to a lesser degree, salary policies emphasize a faculty member's access to federal funding, particularly in the form of NIH grants. With this connection in mind, plaintiff attempts to support his claim that these policies have a disparate impact on the class protected by the ADEA by introducing NIH's own statistics concerning the rate at which persons in different age ranges succeeded in their applications for NIH grant funding for the years 1986 through 1995.[126]

| | Success Rates of NIH Grant Applicants By Applicant Age | | | |
|---|---|---|---|---|
| Fiscal Year | | Applicant Age | | |
| | <36 | 36–45 | 46–55 | >55 |
| 1986 | 33.2% | 32.3% | 29.5% | 25.4% |
| 1987 | 33.1% | 34.4% | 32.8% | 31.8% |
| 1988 | 33.3% | 31.1% | 28.6% | 27.1% |
| 1989 | 29.7% | 27.7% | 25.3% | 22.5% |
| 1990 | 22.9% | 23.2% | 22.8% | 19.9% |
| 1991 | 29.1% | 28.5% | 27.8% | 23.9% |
| 1992 | 31.5% | 28.4% | 26.9% | 23.3% |
| 1993 | 24.3% | 22.2% | 21.5% | 19.0% |
| 1994 | 26.7% | 23.7% | 24.3% | 19.8% |
| 1995 | 25.4% | 25.5% | 26.1% | 21.4% |
| Average | 30.7% | 28.8% | 27.1% | 24.5% |

**121.** *Id.* ¶¶ 30–31.

**122.** In light of the Court's disposition of this claim, it is unnecessary to resolve the question of whether the appropriate statute of limitations period is 300 days, as presumed in the Court's Order dated June 2, 1997, or 180 days from the date of the alleged unlawful employment practice.

**123.** Scotch Aff. ¶ 66; Lee Aff. ¶ 4.

**124.** Lee Aff. ¶ 5.

**125.** Scotch Aff. ¶¶ 50–56.

**126.** Nelson Decl. Ex. 9. Naftchi relies also on another NIH study which contains similar data. *Id.* Ex. 8.

From these statistics, Dr. Naftchi jumps to the conclusion that defendants' lab and salary policies have a disparate impact based on age. There are numerous flaws in this logic.

Foremost among these is that, although the statistics no doubt reflect the impact of NIH grant-awarding policy on NIH grant applicants, they do not necessarily reflect the impact of defendants' policies on their faculty. In other words, even assuming that the NIH statistics reveal that NIH's grant award policies have a statistically significant disparate impact upon persons over the age of 40,[127] it does not inexorably follow that defendants' policies also have a disparate impact on their faculty. It is possible, for example, that relatively few persons over the age of forty receive NIH grants, and yet that NYUMC faculty members over the age of forty comprise an unusually large percentage of those successes. In other words, this evidence reflects neither the relevant policies (reliance on NIH grant success) nor the experience of the relevant population (N.Y.U faculty), and thus is not probative of whether the relevant policies disparately impact an age-protected segment of the relevant population.

Nor has plaintiff provided any basis for concluding that any disparate impact revealed by these statistics is statistically significant. While a showing of statistical significance may not be an absolute *sine qua non* of a disparate impact claim,[128] it is nonetheless true that evidence of statistical significance is necessary to show that a statistical disparity is not attributable merely to random chance.[129] In the absence of such evidence, it is difficult to evaluate statistical evidence, particularly where, as here, the numerical discrepancies are not overwhelming on their face.

An additional problem, relating to the challenge to defendants' salary policy, is that the use of the NIH statistics appears to depend on the premise that the sole basis for defendants' salary decisions is success in obtaining NIH funding. Defendants, however, have explained that their salary decisions depend on a multi-faceted analysis in which success in the NIH grant process is the foremost but not the only element.[130] Dr. Lee, in whom discretion over raises was vested, testified that access to federal funding was a primary factor in his salary evaluations but that he considered also publications during the prior year, the value of current research projects, and the overall level of available funding.[131]

To summarize, plaintiff's NIH statistics simply do not perform the work that he demands of them. Even assuming that these statistics demonstrate a disparate impact upon NIH grant applicants, which is by no means an easy assumption in the absence of evidence of statistical significance, the data speak only to NIH's grant award policies and say nothing about the impact of defendants' own policies. This does not end the inquiry, however, as there is other statistical evidence before the Court which is relevant and inflicts an additional fatal blow to Dr. Naftchi's disparate impact claims.

Defendants have submitted a profile of DRM faculty members relating their ages, annual salaries, and percentage raises for the years 1990 through 1996. This evidence is particularly relevant to the disparate impact claim based on defendants' salary policy because the DRM is a self-contained unit for

---

**127.** As will be discussed in more detail below, in order to establish a disparate impact claim under the ADEA a plaintiff must demonstrate that the challenged policy has a disparate impact on the entire class protected by the ADEA, *i.e.*, persons at least forty years old.

**128.** See *Waisome v. Port Authority of New York & New Jersey*, 948 F.2d 1370, 1375–77 (2d Cir. 1991) ("The rule that emerges from prior cases is that a prima facie case is made out by showing either a gross statistical disparity, or a statistically significant adverse impact coupled with other evidence of discrimination.")

**129.** See *Ottaviani v. State Univ. of N.Y.*, 875 F.2d 365, 371 (2d Cir.1989), *cert. denied*, 493 U.S. 1021, 110 S.Ct. 721, 107 L.Ed.2d 740 (1990) ("Before a deviation from a predicted outcome can be considered probative, the deviation must be 'statistically significant.' "); *see also W.G. Bennett v. Total Minatome Corp.*, 138 F.3d 1053, 1062 (5th Cir.1998).

**130.** See, *e.g.*, Lee Aff. ¶¶ 4,5.

**131.** *Id.* ¶ 5.

purposes of salary decisions.[132] Significantly, this evidence reveals that all of the faculty members of the DRM are above the age of forty.[133] This is another nail in the coffin of plaintiff's disparate impact claim insofar as that claim relates to salary decisions.

In *Criley v. Delta Air Lines, Inc.*,[134] the Second Circuit held that ADEA claims premised upon the disparate impact doctrine "must allege a disparate impact on the entire protected group, *i.e.*, workers aged 40 and over." [135] Thus, where the *Criley* plaintiffs complained that Delta's hiring policies had a disparate impact on persons aged 55 and older, but 94.1 percent of the persons actually hired by the employer were aged 40 and above, their disparate impact claim was properly dismissed on summary judgment.[136] Put another way, the impact of *Criley* is that, from the point of view of the disparate impact in contrast to the disparate treatment doctrine, all persons over the age of forty are the same age.[137] Defendants' salary decisions, made at the departmental level, simply cannot cause a statistical disparity within the

DRM because everyone in that department is within the protected age group.[138]

For all of the foregoing reasons, summary judgment dismissing Dr. Naftchi's disparate impact claims is granted.

### 3. Retaliation

■ Claims of unlawful retaliation under the ADEA, like claims of disparate treatment, are subject to the *McDonnell Douglas* burden-shifting analysis originally set forth in the Title VII context.[139] In order to establish a *prima facie* case of unlawful retaliation, Dr. Naftchi must demonstrate that (1) he participated in activity protected by the ADEA, (2) defendants were aware of this participation, (3) he suffered an adverse employment action, and (4) a causal nexus existed between his protected activity and the adverse employment action.[140]

The protected activities in which Dr. Naftchi engaged were his filing of a charge of discrimination with the EEOC on June 26, 1995 and his filing of this lawsuit on October 29, 1996. Awareness of these activities is not seriously disputed,[141] and it appears that the

132. Scotch Aff. ¶¶ 65–66; Lee Aff. ¶¶ 4–5.

133. Def. Ex. K.

134. 119 F.3d 102.

135. *Id.* at 105 (citing *Lowe v. Commack Union Free Sch. Dist.* ., 886 F.2d 1364, 1372–73 (2d Cir.1989), *cert. denied*, 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990)).

136. *Id.*

137. This principle does not give employers free rein to discriminate on the basis of age in these circumstances. As the Second Circuit stated in *Lowe v. Commack Union Free School Dist.*, 886 F.2d 1364, "where discrimination occurs 'within' a protected group, *e.g.*, where those in their fifties are discriminated against in favor of those in their forties, there is nothing to prevent a 55 year old plaintiff from prevailing on a disparate *treatment* claim. The use of disparate impact analysis is but one means of demonstrating age discrimination." *Id.* at 1372. Indeed, Dr. Naftchi's own disparate treatment claim, though unsuccessful, is an example of this.

138. Lab space allocation decisions are made at least in part at the school-wide level. Scotch Aff. ¶¶ 20, 22, 24, 52. Even assuming that the relevant decision for purposes of plaintiff's disparate impact claim was not made at the departmental level, however, plaintiff has come forward with

no statistical evidence indicating the relative ages of those who have lost or gained lab space in recent years. In an Order dated July 7, 1997, the Court directed that defendants supply this information for the DRM and any three other departments named by plaintiff. This gave plaintiff the right to sample twenty percent of the Medical School's departments and, depending upon the size of the departments selected, a greater percentage of the research faculty. Indeed, the option of selecting departments rather than accepting randomly selected ones gave plaintiff some opportunity to skew the statistics in his own favor. Nevertheless, plaintiff has come forward with no evidence on this point other than his own anecdotal recollections as stated in his declaration. Nor has plaintiff sought additional discovery or other relief pursuant to FED R.CIV.P. 56(f).

139. *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 465 (2d Cir.1997).

140. *Id.* The elements of the retaliation claims based on state and local law are the same. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir.1996).

141. On August 24, 1995, NYU's office of legal counsel responded to the EEOC's request for a position statement, thus establishing awareness of Dr. Naftchi's participation in protected activity. Nelson Decl. Ex. 12.

adverse employment action requirement is satisfied by the denial of raises for 1996, 1997, and 1998 and the elimination of Dr. Naftchi's office space in October 1997.

The only real dispute at the *prima facie* stage is whether plaintiff has established a causal connection between these actions and his protected activity. The relatively short period of time between the filing of the charge and the decision not to give Dr. Naftchi a raise for 1996 suffices to establish such a connection.[142] The same may be said about the filing of this lawsuit and the decision to deny a raise for 1997. Although it is less clear whether the decisions not to give him a raise for 1998 and to take away his office in October 1997 were sufficiently close in time to the filing of the lawsuit to establish the requisite nexus, the Court finds that the fact that these actions were taken during the course of the lawsuit suffices to establish the causal connection for purposes of the *prima facie* case. With the *prima facie* case thus established, the burden shifts to defendants to articulate lawful explanations for these decisions.

■ As noted above in the context of Dr. Naftchi's disparate treatment claim, defendants have articulated a lawful reason for their decision, in each of the relevant years, not to give a raise to Dr. Naftchi: the department chairman, in whom discretion in this matter is vested, determined in each case that Dr. Naftchi did not merit a raise because of his lack of production in terms of obtaining grant funding, publishing articles, and various other subjective criteria. Similarly, the taking of the office was explained as the result of an ongoing effort to reallocate space to more productive uses. At this point, the presumption created by the *prima facie* case drops out, and plaintiff must, in order to avoid summary judgment, demonstrate the existence of a genuine issue of material fact on the question of whether defendants intended to retaliate against him.

Dr. Naftchi's evidence supporting his view of the Medical School's real motivation for

denying him raises was discussed previously in the context of his claims of disparate treatment. The Court's analysis of that same evidence is different, however, in the retaliation context. In the disparate treatment context, the fact that Drs. Lee and Eberstein continued to receive raises though lacking federal funding tended to show pretext but demonstrated also a lack of age animus in light of the fact that they are approximately Dr. Naftchi's age. In the retaliation context, where the concern no longer is with age discrimination itself, the self-defeating effect of this evidence drops out. While the discrepancy in raises between Drs. Lee, Eberstein, and Naftchi may be attributable to the fact that Drs. Lee and Eberstein, unlike Dr. Naftchi, are administrators in addition to being faculty members and while Dr. Eberstein testified that he did not receive raises in 1994 and 1995, the fact that Drs. Lee and Eberstein at times may have received raises when Dr. Naftchi did not is, at most, mildly probative of pretext. To this, Dr. Naftchi adds the causal inference that arises from the temporal proximity between his protected activities and the alleged acts of retaliation, the ability of which to support an inference of retaliation is inversely related to the amount of time that passed between the events. Hence, the Court concludes that a reasonable juror arguably could infer from this combination of evidence that defendants' were motivated, at least in part, by a desire to retaliate against Dr. Naftchi for filing an EEOC charge and, later, for filing this lawsuit. Summary judgment therefore is denied as to Dr. Naftchi's claim of retaliation.

*State Law Claims*

1. *Age Discrimination Under the NYSHRL and the NYCHRL.*

In addition to asserting his age discrimination claims under the ADEA, Dr. Naftchi asserts these claims under the parallel provisions of the state and city human rights laws, which are interpreted analogously to the ADEA.[143] For the reasons stated in the con-

---

142. *See Manoharan v. Columbia Univ. Coll. of Phys. & Surgeons,* 842 F.2d 590, 593 (2d Cir. 1988) (causal connection established indirectly

by showing that the protected activity was closely followed in time by the adverse action).

143. A three year statute of limitations applies to claims under the state and local human rights

text of the ADEA analysis, summary judgment dismissing the state and local age discrimination claims is granted except as to the retaliation claim.[144]

■ Defendants' contend that Dr. Naftchi's retaliation claim under the NYCHRL must be dismissed in any event because Dr. Naftchi has not served a copy of the complaint on the City Commissioner of Human Rights or the New York City Corporation Counsel as required by N.Y.C.A.C. Section 8–502(c). This Court held in *Westphal v. Catch Ball Products Corp.*,[145] however, that the failure to satisfy the service requirements of Section 8–502(c) is not fatal to a plaintiff's claim.[146] Plaintiff's alleged failure to comply with this filing requirement therefore is of no consequence.

■ Finally, defendants argue that the retaliation claims under state and local law may not be maintained against the individual defendants. They contend that the record contains nothing but conclusory allegations that they are liable as aiders and abetters of the institutional defendants' unlawful conduct and that such allegations are insufficient to withstand summary judgment.

Section 296, subd. 6, of the NYSHRL provides that it shall be an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." [147] Thus, "a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under the HRL." [148] The question is whether there are triable issues of fact concerning the participation of Drs. Farber, Lee, and Scotch in the alleged retaliatory conduct. This boils down to whether there is evidence that any of these individuals participated in the decisions to deny raises to Dr. Naftchi for 1996, 1997, and 1998 and to take away his remaining office space in 1997.

Dr. Lee, in whom the discretion to give raises was vested, participated in the salary decisions as well as the decision to take away Dr. Naftchi's office.[149] This suffices to create a triable issue of fact as to his participation in all of the alleged retaliatory conduct. There is evidence also that the decision to take away Dr. Naftchi's office was made by the Dean's Office, and this generates a triable issue of fact as to Dr. Farber and Dr. Scotch's participation in that particular decision. There is no evidence, however, that Drs. Scotch or Farber had a hand in the challenged salary decisions. The retaliation

---

laws. N.Y.C.P.L.R. § 214(2) (McKinney's 1990); *Van Zant*, 80 F.3d at 714. Thus, as the Court ruled in its Order dated June 2, 1997, Dr. Naftchi's discrimination and retaliation claims under state and local law are prohibited to the extent they seek relief for events occurring before October 29, 1993. This does not, however, bring any significant events within the scope of the state and local claims that were not already within the scope of the federal claim.

144. In the ADEA analysis, one ground articulated for dismissing plaintiff's disparate impact claim concerning salary was *Criley v. Delta Air Lines, Inc.*, 119 F.3d 102. The *Criley* approach to disparate impact claims is applicable only to claims under the ADEA because the NYSHRL and the NYCHRL, unlike the ADEA, do not limit their protections to persons over the age of forty. This raises the question of how to determine, in the absence of such a dividing line between protected and unprotected classes, the relevant comparators in a state law disparate impact case. It is not necessary to confront this problem, however, as the *Criley* ground was only a sufficient and not a necessary basis for the Court's rejection of plaintiff's federal claim. The alternative ground provided by the inadequacy of plaintiff's statisti-

cal evidence is sufficient as well to warrant dismissal. In any event, even were the rationales for the dismissal of plaintiff's federal disparate impact claim inapplicable to his state and local claims, the Court nonetheless would dismiss the state and local claims for lack of subject matter jurisdiction.

145. 953 F.Supp. 475 (S.D.N.Y.1997).

146. *Id.* at 481; *accord, Teller v. America West Airlines, Inc.*, 240 A.D.2d 727, 728, 659 N.Y.S.2d 314, 315 (2d Dept.1997) (following *Westphal*); *Bernstein v.1995 Associates*, 217 A.D.2d 512, 515–16, 630 N.Y.S.2d 68, 71–72 (1st Dept.1995).

147. N.Y.EXEC.L. § 296, subd. 6. The NYCHRL contains the identical provision. *See* N.Y.C. AD. C. § 8–107(6).

148. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir.1995).

149. *See, e.g.*, Naftchi Decl. ¶ 38 ("I received notice from Dr. Lee that I would have to vacate even the small cubicle which serves as my sole remaining work space.")

claim therefore is dismissed as to Drs. Farber and Scotch insofar as it is premised on the allegations that they aided and abetted the decision to deny raises to Dr. Naftchi in 1996, 1997, and 1998.[150] All of the individual defendants remain potentially liable, however, for the decision to eliminate the office space in October 1997.

### 2. The Contract and Tortious Interference Claims

Subject matter jurisdiction over Dr. Naftchi's various state law claims is predicated upon 28 U.S.C. § 1367(a), which provides in relevant part that

> "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." [151]

The effect of Section 1367(a) was to codify the analysis set forth originally in *United Mine Workers of America v. Gibbs*,[152] which held that the "state and federal claims must derive from a common nucleus of operative fact" in order to support pendent jurisdiction.[153]

In light of the Court's grant of summary judgment dismissing the disparate treatment and disparate impact claims, the only federal claim remaining in this suit is the retaliation claim. This is significant, for Dr. Naftchi's common law claims for breach of contract, tortious interference with contractual relations, and tortious interference with prospective contractual relations do not share a common nucleus of operative facts with plaintiff's remaining federal cause.

The retaliation claim is based on the contention that, in the wake of Dr. Naftchi's filing of a charge of discrimination with the EEOC in June 1995 and his filing of this lawsuit in October 1996, defendants retaliated against him by denying him salary increases for 1996, 1997, and 1998 and by taking away his remaining office space. In contrast, Dr. Naftchi's contract and tortious interference claims are premised on his contention that he is entitled by contract to have his research supported by the Guggenheim Funds and that defendants have breached or tortiously interfered with this contract. The factual predicates of these claims simply do not overlap in any significant manner with Dr. Naftchi's retaliation claim, and for this reason, these claims are dismissed on jurisdictional grounds.

In addition, Dr. Naftchi claims that defendants' have tortiously interfered with prospective contractual relations in that their failure to provide him with lab space interferes with his ability to acquire future research funding. Once more, there is no significant overlap between the operative facts of this common law claim and the retaliation claim. Therefore, Dr. Naftchi's tortious interference with prospective contractual relations claim is dismissed on jurisdictional grounds.

The two remaining breach of contract claims also lack the requisite common nucleus of operative facts. First, Dr. Naftchi alleges that he is entitled by a 1968 oral employment contract to laboratory space and

---

**150.** Individual liability on the discrimination and retaliation claims in this case depended upon the state and city human rights laws, as there is no individual liability under the ADEA. *See, e.g., Storr v. Anderson School,* 919 F.Supp. 144, 146 (S.D.N.Y.1996).

**151.** 28 U.S.C. § 1367(a).

**152.** 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *see* 13B CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3567.1 (Supp.1997).

**153.** *Id.* at 725, 86 S.Ct. 1130.
"The Second Circuit's recent decision in *Itar–Tass Russian News Agency v. Russian Kurier,*

*Inc.,* 140 F.3d 442 (2d Cir.1998), is not to the contrary. *Itar–Tass* held that Section 1367(c), which specifically enumerates the situations in which a district court may decline to exercise existing supplemental jurisdiction, superseded that portion of *Gibbs* which gave district courts relatively broad discretion to decline to exercise existing supplemental jurisdiction. *Id.* at 446–47. *Itar–Tass* did not suggest, however, that Section 1367(a) altered the *Gibbs* standard for determining whether supplemental jurisdiction exists in the first place." *Manela v. Garantia Banking Ltd.,* 5 F.Supp.2d 165, 178 n. 113 (S.D.N.Y.1998)

periodic raises.[154] Second, he contends that he is entitled to "the right of academic freedom in both teaching and research" by an implied contract between defendants and the entire faculty.[155] The most that can be said about either of these claims, from the perspective of possible overlap between them and the retaliation claim, is that the alleged oral contract involves Dr. Naftchi's right to periodic raises. Beyond that, the basis for each of these claims, one rooted in the late 1960's and the other in the employee's handbook and the course of dealings between the faculty and administration of the NYUMC, are divergent from the basis of the retaliation claim. Therefore the remaining contract claims also are dismissed on jurisdictional grounds on the alternative bases that they do not arise from a nucleus of operative fact common with, and in any event would raise issues substantially predominating over, the remaining federal claim.

### Conclusion

Defendants' motion for summary judgment is granted in all respects except that the motion is denied with respect to plaintiff's claims of retaliation (1) under the ADEA, the NYSHRL, and the NYCHRL against the institutional defendants, (2) under the NYSHRL and the NYCHRL against all the individual defendants insofar as those claims are based on the decision to take away Dr. Naftchi's office, and (3) under the NYSHRL and the NYCHRL against Dr. Lee insofar as those are based on the decisions to deny raises to Dr. Naftchi. The dismissal of the federal claims and the state and local discrimination claims is on the merits. The dismissal of the common law claims is for lack of subject matter jurisdiction.

SO ORDERED.

---

**154.** Were the Court to retain jurisdiction over this particular claim, it would nonetheless dismiss it on the ground that the alleged agreement is paradigmatic of the sort prohibited by the statute of fraud's prohibition on oral agreements that cannot be performed within a year's time.

**155.** Pl. Br. at 27. Dr. Naftchi goes on to explain that defendants' Faculty Handbook provides for "freedom of teaching and research." From this, he extrapolates an apparently unlimited right to laboratory access and funding for research. *Id.* at 28. Were this claim not dismissed on jurisdictional grounds, it nonetheless would be dismissed on the ground that the Faculty Handbook's reference to academic freedom could not possibly support the construction which Dr. Naftchi seeks to place upon it. *Gertler v. Goodgold,* 107 A.D.2d 481, 487 N.Y.S.2d 565 (1st Dept.), *aff'd,* 66 N.Y.2d 946, 498 N.Y.S.2d 779,

489 N.E.2d 748 (1985), is instructive. Dr. Gertler, a colleague of Dr. Naftchi's at the DRM, sued NYU for breach of contract, alleging among other things that the school had denied him "adequate space for research." had failed to cooperate with him in his pursuit of research grants, and that this conduct infringed upon his academic freedom and tenure. *Id.* at 568. The First Department rejected his contract claims as failing to state a cause of action, explaining that the "university has never expressly, by contract or otherwise, obligated itself to provide the amenities plaintiff claims, and thus has not relinquished its authority to make its own academic judgments and to administer and allocate its resources. The benefits which plaintiff seeks are undoubtedly perquisites of faculty life, but they are not contractual entitlements." *Id.*