Joyce WOLF, Plaintiff,

v.

**BOARD OF EDUCATION OF THE CITY OF NEW YORK, Rudolph Crew as Chancellor of the New York City Public School System, and Michael Kadish as Superintendent and Deputy Superintendent of District 8, Defendants.**

**No. 93 Civ. 6059(WHP).**

United States District Court, S.D. New York.

March 30, 2001.

New York ("BOE"), Rudolph Crew as Chancellor of the New York City public school system ("Crew"), and Michael Kadish ("Kadish"), as superintendent and deputy superintendent of Community School District 8 ("District 8"). Wolf claims that defendants retaliated against her by failing to grant her interviews for promotions, failing to appoint her as an interim assistant principal, and failing to promote her as a permanent principal. The procedural history of this litigation is described in detail in a prior memorandum and order and is not repeated here. *See Wolf v. Bd. of Educ.* 93 Civ. 6059(WHP), 2000 WL 28157 (S.D.N.Y. Jan. 14, 2000).

This memorandum and order contains the Court's findings of facts and conclusions of law following a bench trial. After the trial concluded, Wolf moved pursuant to Rule 60(b) of the Federal Rules of Civil Procedure to reopen claims previously dismissed by this Court. *See Wolf,* 2000 WL 28157, at *5. For the reasons set forth below, the amended complaint is dismissed and Wolf's Rule 60(b) motion is denied.

Edward H. Wolf, Bronx, NY, for Plaintiff.

John Weiss, Assistant Corporation Counsel, New York City, for Defendants.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

This action involves claims of retaliation and breach of a settlement agreement by an assistant principal in the New York City public school system. In August 1997, plaintiff Joyce Wolf ("Wolf") moved to reopen this action based on alleged violations of an earlier stipulation of settlement and discriminatory retaliation by defendants Board of Education of the City of

## FINDINGS OF FACT

Wolf is 59 years old. In 1981, she began working for the defendant BOE in District 8 in the South Bronx. (Trial Transcript ("Tr.") at 132–35, 140–41.) In 1990, Wolf applied for a BOE internship to become an assistant principal. (Tr. at 140.) Wolf's application was reviewed by a selection committee that included defendant Kadish. (Tr. at 149, 376.) Although the committee did not select Wolf for the internship program, District 8's superintendent Max Messer ("Messer") exhorted Kadish to secure additional funding and award an internship for Wolf. (Tr. at 150.) Wolf completed the internship program and, along with two other interns, received temporary assignments as interim assistant principals at Intermediate School ("I.S.") 131 in Dis-

trict 8. (Tr. at 143.) In September 1992, the BOE advertised two vacant assistant principal positions for I.S. 131. (Tr. at 145.) Wolf applied for both.

Chancellor's Regulation C–30 governs the BOE's process (the "C–30 Process") for selecting principals and assistant principals. (Tr. at 291; Defs.' Ex. VV: Regulations promulgated May 1, 1990 ("1990 Regulation"); Defs.' Ex. VV 1: Regulations promulgated March 21, 1997 ("1997 Regulation") (collectively, "Regulation C–30").) Pursuant to Regulation C–30, applicants like Wolf undergo several levels of review in a winnowing process. At level I, applicants submit their resumes to a committee (the "C–30 Committee") comprised of six to ten parents of students at the selecting school, a supervisor from the selecting school, two teacher representatives, the district superintendent's designee, and community school board members. (Tr. at 293–94; 1990 Regulation C–30 ¶ IX.B.1.a.1; 1997 Regulation C–30 ¶ IX.B.1.a.1.) Regulation C–30 instructs the district superintendent's designee to assure that the C–30 Committee follows proper procedures and maintains confidentiality, but precludes him from voting for applicants at level I. (Tr. at 378, 630.)

The C–30 Committee reads and scores the applicants' resumes and interviews the ten candidates with the highest-scoring resumes. The C–30 Committee then selects five applicants to proceed to level II. (*See* 1990 Regulation C–30 ¶ IX.B.1.a.1; 1997 Regulation C–30 ¶ IX.B.1.a.1.) Under the 1990 Regulation C–30, the superintendent interviewed the five applicants at level II and recommended two candidates for final interviews with the community school board at level III. (*See* 1990 Regulation C–30 ¶ IX.B.1.a.1.) A revised Regulation C–30 took effect on March 21, 1997 and provided that the district superintendent would make the final selection at level II subject to the Chancellor's approval. (*See* 1997 Regulation C–30 ¶ IX.B.1.a.1.)

After reviewing Wolf's assistant principal applications, the I.S. 131 C–30 Committee interviewed but ultimately rejected her for both positions. (Tr. at 146, 152.) Anthony Orzo, then 32 years-old, received one of the positions. (Tr. at 157.) Thereafter, on August 27, 1993, Wolf sued the District 8's community school board ("Board"), its individual members, and several District 8 officials including Messer and Kadish, alleging that they discriminated against her based on her age in violation of the ADEA and New York State Human Rights Law. (Tr. at 157–58.) Seven months later, the action settled. (Tr. at 159.) Pursuant to that settlement agreement, the Board appointed Wolf to the assistant principal position at I.S. 120 in District 8 on January 3, 1994. (Tr. at 173.) The parties also stipulated that

> Defendant School Board or its members, will not directly, or indirectly, harass, intimidate, or retaliate against [Wolf] in her new position, nor will the fact that [Wolf] has brought the instant action in any way prejudice her in her application for a future position in District 8, but her application will be judged entirely on merit.

(*See* Stipulation and Order, dated Dec. 20, 1993, ¶ 4.)

For the next two and one-half years, Wolf served as I.S. 120's assistant principal under principal Arnold Nager. (Tr. at 175–76.) Nager's frequent absences left Wolf in charge of the curriculum, student meals, discipline, and staffing. (Tr. at 176–77, 196.) During their tenure together, Nager consistently rated Wolf's job performance as satisfactory and com-

mented positively on her performance.[1] (Tr. at 142, 178.) However, I.S. 120 stumbled during the Nager–Wolf administration. After several years of declining academic performance, poor student attendance, and staffing problems, the BOE designated I.S. 120 as a School Under Review and Revision ("SURR") in 1994. (Tr. at 18, 213, 279, 437–38, 510, 581.) A SURR school is inspected regularly by state regulators. (Tr. at 221–22.) If a SURR school cannot improve its performance, it is designated a "redesign school." (Tr. at 213–14.) Once a school is designated for "redesign," the principal has a few semesters to reverse its poor academic trends or the Chancellor will displace the principal as the school's administrator. (Tr. at 213.) In 1995 and 1996, I.S. 120's student reading scores dropped to one of the lowest averages in District 8. (Tr. at 581.)

In August 1996, Nager retired, and Messer began the search for an interim acting principal ("IAP") until a permanent principal could be appointed through the C–30 Process. (Tr. at 184, 186, 191.) Despite her experience as a supervisor at I.S. 120, Wolf was not selected as the IAP. Instead, Messer chose Fred Spinowitz ("Spinowitz"), an assistant principal from a school outside of District 8. (Tr. at 24, 186, 414.) Prior to his appointment as I.S. 120's IAP, Spinowitz was the assistant principal of administration for ten years at John F. Kennedy High School. (Tr. at 6–7.) There, he supervised a large administrative staff, a student body numbering between 5,000 and 6,000 students ages 9 to 14, and a faculty staff of 200. Spinowitz held a masters degree from Pratt Institute and at-

tended Columbia Teacher's College where he became a certified school administrator. Spinowitz also spent eight years as an associate director for Reading Improvement Through Art, a state-funded program using art to improve the reading skills of children. (Tr. at 6–8.) In comparison, Wolf held masters degrees in special education and reading and was also a certified school administrator. (Tr. at 134.) By 1997, Wolf had only four years as an assistant-principal; however, she also had experience supervising an after school reading program. (Tr. at 199–200, 443.) At the time of his appointment, Spinowitz was one of only a handful of IAP's appointed in District 8 who had been selected from outside the district. (Tr. at 537.)

From the start, Wolf disagreed with Spinowitz's administrative style and faulted him for using non-certified teachers, placing teachers in assignments outside of their certifications and being lax with student discipline. (Tr. at 214–15.) Wolf expressed her concerns to Spinowitz, Kadish and other administrators. (Tr. at 216.) While Spinowitz was the IAP, I.S. 120 was designated a "redesign school." (Tr. at 213.)

In the spring of 1997, the C–30 Process to select I.S. 120's permanent principal began. Wolf applied for the position, thereby making I.S. 120 the seventh principalship[2] she had applied for since being appointed assistant principal in January 1994. (Tr. at 200, 207.) Although she had not been interviewed for any principalships within District 8, Wolf received interviews in BOE schools outside of District 8 that

---

1. BOE employees were rated either "satisfactory" or "unsatisfactory." (Tr. at 178.)

2. Within six months of her assistant principal appointment, Wolf began applying for principal positions throughout District 8, in other

BOE districts, and at schools outside the BOE system. (Tr. at 299.) Within District 8, Wolf had also applied for principalships at P.S. 62, I.S. 131, I.S. 123, I.S. 174, I.S. 182 and P.S. 138.

operated under the same C–30 Process. (Tr. at 205, 262, 315–16.) Through records offered at trial, defendants demonstrated that various C–30 Committees had rejected Wolf's applications prior to her I.S. 120 principalship interview. (Tr. at 560–61; Defs.' Ex. K (ranking Wolf's resume 27th out of 27 applicants for I.S. 123 interviews); Tr. at 563, Defs. Ex. C (ranking Wolf's resume 25th out of 31 applicants for I.S. 174 interviews); Tr. at 572, Ex. S (ranking Wolf's resume 12th out of 33 applicants for I.S. 182 interviews).)

On April 11, 1997, Wolf complained to Kadish, who was then acting as District 8's superintendent,[3] that she had not been interviewed for a principal position in District 8. (Tr. at 454; Pl.'s Ex. 70: Complaint Letter.) Shortly thereafter, she received level I interviews for principal positions in I.S. 120, P.S. 138, and I.S. 131.[4] (Tr. at 207.) The C–30 Committee for I.S. 120 selected Wolf and Spinowitz to proceed to level II for an interview with Kadish. Wolf complained to the Board that Kadish, as a defendant in her original complaint, could not serve as an impartial interviewer. The Board opted to allow Kadish to conduct the interview in the presence of a neutral observer, Heywood Feierstein ("Feierstein"), a former BOE principal. (Tr. at 229, 351, 353–55.)

On July 1, 1997, Kadish interviewed Wolf and Spinowitz using the same six questions. Wolf felt that Kadish's questions did not address the problems at I.S. 120 or her ability to lead the school. (Tr. at 255.) Specifically, Wolf objected to the following questions:

Q3. Please write a letter to teachers introducing the New Standards in Language Arts which will be implemented for all students in the fall.

Q5. What do we mean by Authentic Pedagogy and how would you embrace Authentic Pedagogy to improve student achievement?

Q6. Please use a Walt Disney character that relates to your leadership style and tell me what are the similarities.

(*See* Tr. at 253, 484; Defs.' Exs. E, F.) Wolf attempted to discuss changes she envisioned for the school, but Kadish did not permit her to stray from answering his questions. (Tr. at 256.)

Wolf contends that Kadish allotted her less time to answer the questions. Kadish could not recall how much time Spinowitz spent answering each question, but he took notes specifically to ensure that no candidate received extra time. (Tr. at 593, 595.) Moreover, Feierstein testified that each candidate received equal treatment and that nothing inequitable, such as permitting advantageous response times, occurred during the I.S. 120 interviews. (Tr. at 351–52.) In light of Feierstein's role as a neutral observer, and after observing his demeanor at trial, this Court finds that Spinowitz was not given preferential treatment in answering the interview questions.

Wolf also contends that Kadish "called [her] a liar and started a fight" in front of Feierstein when he doubted that she could commute to work in ten minutes and arrive for work daily at 6:10 a.m. (Tr. at 230.) Kadish denied ever asking the question, and Feierstein could not recall having heard it. (Tr. at 362, 485.) Feierstein added that if any noticeable altercation

---

**3.** While Kadish was not appointed as acting superintendent until July 1, 1997, he assumed the duties of the superintendent three months prior to his appointment. (Tr. at 596–97.)

**4.** Because the position at I.S. 131 was filled pursuant to a stipulation in an unrelated action, Wolf does not claim that this selection was motivated by retaliation. (Tr. at 312.)

occurred, he would have remembered the event, and would have interceded at the time. (Tr. at 351, 354–56, 363.) Kadish awarded Spinowitz with higher scores for each of the six questions, and gave Wolf no credit for question six for failing to answer the question. (Tr. at 550; *Compare* Defs.' Exs. E & F.)

Kadish selected Spinowitz as I.S. 120's principal, and Wolf reopened her lawsuit in March 1998. In her amended complaint, Wolf claimed that defendants failed to interview her for positions within District 8, failed to appoint her as interim and permanent principal of I.S. 120, and characterized her as a "troublemaker" to Wolf's prospective employers dehors District 8. (Tr. at 550; Am. Compl. ¶¶ 15, 19, 29, 36, 39, 42.) This Court granted summary judgment for defendants on Wolf's claim regarding defendants' alleged comments that Wolf was a troublemaker and denied defendants' motion in all other respects. *See Wolf*, 2000 WL 28157, at *4.

## CONCLUSIONS OF LAW

### I. *ADEA Retaliation Standards*

 The ADEA prohibits an employer from retaliating against an employee for making a claim of age discrimination against the employer. *See Pellei v. Int'l Planned Parenthood Fed'n/Western Hemisphere Region, Inc.*, No. 96 Civ. 7014(WHP), 1999 WL 787753, at *12 (S.D.N.Y. Sept. 30, 1999). Retaliation claims under the ADEA are subject to the same three-part burden shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 465 (2d Cir.1997); *Pellei*, 1999 WL 787753, at *12; *Naftchi v. New York Univ.*, 14 F.Supp.2d 473, 489 (S.D.N.Y.1998).

 Under the *McDonnell Douglas* burden shifting framework, the plaintiff initially must establish her *prima facie* case of retaliation. To establish a *prima facie* case of retaliation, Wolf must demonstrate her participation in a protected activity known to the defendant, an adverse employment action, and a causal connection between the protected activity and the adverse employment action. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir.1998); *Pellei*, 1999 WL 787753, at *13.

Once Wolf establishes a *prima facie* case, the burden shifts to defendants to rebut the presumption of discriminatory retaliation by articulating a legitimate, non-discriminatory reason for their employment decision. *See McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. at 1824–25; *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Pellei*, 1999 WL 787753, at *13. "Any legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case." *Fisher v. Vassar College*, 114 F.3d 1332, 1335–36 (2d Cir.1997), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000); *see also Cobian v. New York City*, No. 99 Civ. 10533(KMW)(AJP), 2000 WL 1782744, at *11 (S.D.N.Y. Dec. 6, 2000). If the defendant articulates a non-discriminatory reason, the *McDonnell Douglas* burden drops out of the picture, and the plaintiff must persuade the trier of fact that the defendants' purported non-discriminatory reason is pretextual and offered to mask the true discriminatory reasons for their actions. *See St. Mary's Ctr. v. Hicks*, 509 U.S. 502, 510, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); *see also Bickerstaff v. Vassar College*, 196 F.3d 435, 446–47; *Wolf*, 2000 WL 28157, at *2.

■ To overcome a non-discriminatory explanation for failing to promote, a plaintiff must show that she is not only qualified for the position, but that she is the best-qualified candidate for the job under the criteria suggested by the employer. *See Naftchi v. New York Univ.*, 14 F.Supp.2d 473, 480 (S.D.N.Y.1998). A factfinder's role is not to second guess the hiring decisions of employers. *See Davis v. State Univ. of New York*, 802 F.2d 638, 641 (2d Cir.1986) ("The employer need not prove that the person promoted had superior objective qualifications, or that it made the wisest choice, but only that the reasons for the decision were non-discriminatory."); *see also Burdine*, 450 U.S. 248, 258–59, 101 S.Ct. 1089, 1096–97, 67 L.Ed.2d 207 (1981); *Lieberman v. Gant*, 630 F.2d 60, 65 (2d Cir.1980); *Terry v. United States*, 98 Civ. 8249(NRB), 2000 WL 204522, at *4 (S.D.N.Y. Feb. 18, 2000). "When a decision to hire, promote, or grant tenure to one person rather than another is reasonably attributable to an honest even though partially subjective evaluation of their qualifications, no inference of discrimination can be drawn." *Obradovich v. New York City Bd. of Educ.*, No. 89 Civ. 7211(CSH), 1993 WL 97307, at *4 (S.D.N.Y. Mar. 31, 1993) (citing *Lieberman*, 630 F.2d at 67). Only material differences in the objective qualifications of two applicants may support an inference of discrimination. *Daniels v. Runyon*, No. 91 Civ. 4823(EHN), 1993 WL 269621 (E.D.N.Y. July 8, 1993); *see also Byrnie v. Town of Cromwell Pub. Schs.*, 73 F.Supp.2d 204, 212 (D.Conn.1999) (evidence must show that the plaintiff was clearly better qualified to support a finding of pretext in defendant's selection).

## II. *Wolf's Prima Facie Case*

■ Wolf's burden of establishing a prima facie case is slight and may be met with de minimis evidence. *See Wanamak-*

*er v. Columbian Rope Co.*, 108 F.3d 462, 465 (2d Cir.1997). Defendants argue that Wolf has failed to satisfy this low threshold. Defendants concede that Wolf's filing of this lawsuit was a protected activity and that their failure to promote her constituted an adverse employment activity. However, they argue that Wolf failed to establish a causal connection between the two because "years passed between [Wolf's] 1993 Complaint and any arguably adverse employment action." (*See* Defs. Proposed Findings of Fact and Conclusions of Law ¶¶ 124, 125, 129.)

■ Proof of a causal connection may be established by evidence of disparate treatment of fellow employees who engaged in similar conduct. *DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir.1987); *see also Wolf*, 2000 WL 28157, at *3. Wolf has offered sufficient evidence of a causal connection between the filing of her original complaint and defendants' alleged actions to establish her prima facie case. Wolf met the minimum qualifications to be a school principal. (Tr. at 134–41.) Four less experienced principals were promoted to the position of principal in District 8 ahead of her. (Tr. at 640.) Further, Spinowitz's appointment conflicted with District 8's customary practice of appointing principals from candidates within the district. Accordingly, this Court finds that Wolf established a causal connection based on the disparate treatment afforded her. Because Wolf has established her *prima facie* case, the defendants bear the burden of articulating a non-discriminatory reason for failing to interview or promote Wolf.

## III. *Defendants' Non–Discriminatory Reasons for not Promoting Wolf*

■ Defendants respond that the various C–30 Committees, comprised mostly of

parents from the district, declined to interview Wolf. (*See* Defs.' Findings of Facts and Conclusions of Law ¶¶ 148–62.) Defendants also maintain that they did not select Wolf as IAP or principal of I.S. 120 because Spinowitz was a more highly qualified candidate. (*See* Defs.' Findings of Facts and Conclusions of Law ¶¶ 141–42.) Further, defendants claim that they had concerns regarding Wolf's writing skills, her knowledge of school curriculum, her relationship with District 8's parents, and her ability to work as a "team player." (Tr. at 409–11, 429–30.) Moreover, defendants demonstrated that Spinowitz's qualifications made him a comparable if not superior choice to lead I.S. 120. Because defendants have satisfied their burden of rebutting Wolf's *prima facie* case, Wolf must establish that the non-discriminatory justifications are pretext.

## IV. Wolf's Claim that Defendants' Reasons are Pretextual

### A. Failure to Interview

■ Wolf concedes that under Regulation C–30, a candidate cannot progress without the C–30 Committee's approval, and that parents comprise the committee's largest voting bloc. (Tr. at 293.) Wolf contends that defendants' reliance on the C–30 Process is pretextual because Kadish, as the superintendent's designee, could be unduly influential at level I, or could circumvent the C–30 Committee entirely. Wolf maintains that the C–30 Process is "fatally flawed by virtue of the fact that the superintendent's designee can come into a group of parents, ... and by his body language [and] groans ... signal how he feels about a particular candidate." (Tr. at 153.) To illustrate a designee's ability to dominate a level I interview, Wolf offered an anecdote from her I.S. 131 assistant principal interviews when Kadish centered an interview around role-playing where he pretended to be an angry parent. (Tr. at 153.) However, nothing in Regulation C–30 precludes the superintendent from participating in level I interviews. Contrary to discouraging Kadish's participation, Regulation C–30 provides that the superintendent's designee "shall chair the committee but shall not vote on the candidates." (1990 Regulation C–30 ¶ IX.B.1.a.1.) In addition, Wolf recounted Kadish's conduct during level I interviews, but offered no evidence demonstrating that he had influence over the resume screening process, which is precisely where Wolf was cut from the pack. Wolf's speculation about Kadish's influence over the resume screening process does not defeat the legitimate non-discriminatory reasons offered by defendants and supported by their records. *See Cruse v. G & J Publ'g*, 96 F.Supp.2d 320, 331 (S.D.N.Y. 2000) (plaintiff cannot show pretext absent direct or circumstantial evidence of intentional discrimination); *see also Loughran v. Manhattan Life Ins. Co.*, No. 84 Civ. 6157(LLS), 1987 WL 10385, at *6 (S.D.N.Y. Apr. 24, 1987) (speculation is insufficient to overcome rebuttal evidence of non-discriminatory reasons).

Wolf also asserts that Kadish could have circumvented the C–30 Committee and advanced her to level II. In 1994, Kadish, acting as the superintendent's designee during a C–30 Process to appoint a principal of P.S. 62, advanced two candidates, Sharon Chearny ("Chearny") and Elvira Barone ("Barone"), past the C–30 Committee. (Tr. at 378.) While Regulation C–30 permits the superintendent's designee to advance two candidates to the interview stage of level I, Kadish testified that he advanced Chearny and Barone to level II. (Tr. at 388; 1990 Regulation C–30 ¶ IX.B.1.a.1.) Even if Kadish exceeded his authority under Regulation C–30 for Barone and Chearny, that does not evince

discriminatory animus toward Wolf. Both Chearny and Barone offered laudable credentials for Kadish to consider: Chearny had administrative experience from the top performing elementary school district in New York City, and Barone, the assistant principal at P.S. 62, came highly recommended by her superiors. (Tr. at 382–87.) Moreover, Kadish advanced Chearny and Barone after P.S. 62's C–30 Committee had already determined that Wolf did not rank high enough as a candidate to merit an interview. (Tr. at 388.) Because Wolf has not shown that Kadish relied on anything but "an honest, even though partially subjective, evaluation of their qualifications," no inference of discrimination can be drawn. *Obradovich v. New York City Bd. of Educ.*, No. 89 Civ. 7211, 1993 WL 97307, at *4 (S.D.N.Y. March 31, 1993) (citing *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir.1980)).

## B. *The Interim Acting Principal Appointment*

Wolf argues that defendants' mischaracterization of her qualifications and their failure to follow District 8's normal policy of selecting IAP's from within the district demonstrate that their reasons for selecting Spinowitz to be I.S. 120's IAP are pretext. (Tr. at 527, 537, 551.)

At most, six of the last thirty IAP's appointed in District 8 were from outside the district. (Tr. at 537.) However, even if only ten to twenty percent of District 8 appointees come from outside the district, this Court does not find the defendants' decision to deviate from the norm to be evidence of retaliation. Clearly I.S. 120 was a school in jeopardy. Reading scores and pupil attendance were declining and staffing was problematic. The defendants should not be faulted for recruiting outside District 8 in their effort to change the fabric of I.S. 120's administration.

The central theme of Wolf's claim is that Spinowitz's inexperience with SURR schools and I.S. 120's eventual regression to "redesign" status and then to the chancellor's control belie the defendants' position that Spinowitz was qualified. (Tr. at 190, 196.) Ironically, Wolf asserts that she was more qualified to administer a SURR school because she was part of the administration when I.S. 120 fell into SURR status. (Tr. at 221–22.) I.S. 120's decline under Spinowitz does not demonstrate that the defendants did not believe that he was the more qualified candidate. A candidate's qualifications do not necessarily assure competent performance. This Court will not assign fault for I.S. 120's decline to Spinowitz, Wolf, or Nager. A tremendous amount of improvement was needed (Tr. at 437), and as Wolf herself testified, changing a SURR school could take many years. (Tr. at 266.)

Wolf is a dedicated public servant. Throughout her testimony, this Court was impressed with her enthusiasm for the teaching profession and her selfless devotion to District 8 and the seemingly intractable problems of New York City's public schools. However, even if Spinowitz was not the best candidate, the ADEA does not require that employers make wise choices, only that they act in a non-discriminatory fashion.

Accordingly, for the reasons set forth above, this Court concludes that Wolf has failed to demonstrate by a preponderance of the evidence that the defendants retaliated against her by appointing Spinowitz as the IAP.

## C. *The C–30 Process Appointment*

As further proof of pretext, Wolf argues that her level II interview demonstrates the defendants' lack of objectivity in considering the candidates. Wolf argues that while typical interview questions concern

the administrator's involvement with the curriculum and teacher development, Kadish's questions were atypical, inappropriate, and irrelevant to I.S. 120's problems, and designed to exclude Wolf as a candidate. (Tr. at 247–49, 251–55.)

According to Wolf, Kadish's request for a writing sample in question three was unusual for a level II interview. (Tr. at 253–54, 257.) However, defendants consistently stressed that strong writing was essential to functioning as a principal. (Tr. at 121, 409–10.) Further, Feierstein acknowledged that he had observed other interviews where candidates were asked to give a writing sample. (Tr. at 367.)

Wolf further claims that question five favored Spinowitz because Kadish had once lectured District 8's principals on the topic of "authentic pedagogy." (Tr. at 484.) Despite calling both Kadish and Spinowitz as witnesses, Wolf never inquired whether Spinowitz attended the authentic pedagogy lecture or whether Kadish was aware that Spinowitz attended the lecture. Wolf's assertion is thus pure speculation.

Finally, Wolf claims that her score of zero for question six demonstrates Kadish's discriminatory bias. (Tr. at 550; see Defs.' Exs. E, F.) Kadish's notation that Wolf "did not answer [the] question," (see Defs. Ex. E), is confirmed by Wolf's testimony that she discussed Spinowitz's administration of I.S. 120 instead of addressing what she felt were "irrelevant" questions. (Tr. at 245–48, 256.) Kadish's failure to award partial credit on question 6 is not emblematic of discriminatory animus. Although Wolf claims Kadish was combative during the interview, Wolf's concession that she veered from his questions to discuss her opinions about I.S. 120 make it clear that she contributed to the interview's discordant atmosphere. This Court concludes that Wolf has failed to meet her burden of persuasion in es-tablishing that Kadish unfairly scored the interviews. In conclusion, Wolf has not established by a preponderance of the evidence that the I.S. 120 interview was a pretext to mask a discriminatory promotion.

## V. *Wolf's Rule 60(b) Motion*

In dismissing Wolf's claims that Kadish and other defendants made derogatory comments or gave unfavorable references to Wolf's prospective employers outside of District 8, this Court found that Wolf, relying on "little more than the conjecture," lacked actual knowledge of the alleged comments. *Wolf,* 2000 WL 28157, at *4. Wolf now seeks to revive those claims pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, which allows a court, in its discretion, to vacate or amend a final judgment for, *inter alia,* newly discovered evidence. Fed.R.Civ.P. 60(b).

██ A proper case for Rule 60(b) relief is made "only on a showing of exceptional circumstances," *Mendell v. Gollust,* 909 F.2d 724, 731 (2d Cir.1990), and is left to the discretion of the trial court. *Nat'l Petrochemical Co. v. M/T Stolt Sheaf,* 930 F.2d 240, 244 (2d Cir.1991); *see also Mendell ex rel. Viacom, Inc. v. Gollust,* 909 F.2d 724, 731 (2d Cir.1990) ("Motions under Rule 60(b) are addressed to the sound discretion of the district court and are generally granted only upon a showing of exceptional circumstances.").

██ A movant "seeking relief under Rule 60(b)(2) must demonstrate that '(1) newly discovered evidence is of facts existing at the time of [the prior decision]; (2)[she] is excusably ignorant of the facts despite using due diligence to learn about them; (3)[the] newly discovered evidence is admissible and probably effective to change the result of the former ruling; and (4) the newly discovered evidence is

not merely cumulative ... of evidence already offered.' "*Fidelity Partners, Inc. v. First Trust Co.*, 58 F.Supp.2d 55, 59 (S.D.N.Y.1999) (quoting *Tufts v. Corporation of Lloyd's*, 981 F.Supp. 808,ˊ 812 (S.D.N.Y.1996)). The newly discovered evidence brought to the Court's attention must be "highly convincing." *Veloz v. New York*, No. 98 Civ. 567(RWS), 1999 WL 642883, at *3 (Aug. 24, 1999) (citing *Kotlicky v. United States Fidelity and Guar. Co.*, 817 F.2d 6, 9ˊ(2d Cir.1987)).

■ Wolf proposes that testimony given on the last day of trial by Vincent Locascio ("Locascio"), a consultant to the Board of Education, constitutes "the first admission of [a negative referral] by anyone connected to the defendants." (Letter from Edward H. Wolf, Esq. ("Wolf Letter"), dated Sept. 16, 2000, at 4.) Specifically, Wolf offers Locascio's cross-examination testimony in the following exchange:

Q: Was Ms. Wolf offered a position in [Community School 77] as a principal?

A: Yes.

(Tr. at 635.) Wolf's assertion is without merit. Far from linking Kadish to Funes, Locascio's testimony that Wolf was offered a principalship contradicts her claim that Kadish actively discouraged her application. Wolf argues that this Court should group this testimony with a statement by Mary Rivera, the superintendent of Community School 77's district, that she checked the references of the applicants, and the testimony of Mildred Funes, a principal in Community School District 15, that Rivera described Wolf as a "troublemaker." (Wolf Letter at 6.) From this amalgamation, Wolf concludes that Rivera "picked up the phone and called Mr. Kadish, [and] ... was told that [Wolf] was a troublemaker." (Wolf Letter at 6.) This Court finds her conclusion to be mere speculation.

Moreover, Wolf fails to meet her burden of being "excusably ignorant of the facts despite using due diligence to learn about them." *Fidelity Partners*, 58 F.Supp.2d at 59. Wolf argues that Rivera and Kadish prevented her from discovering Locascio's testimony by testifying at depositions that they did not recall discussing Wolf's appointment with Locascio or one another. (Wolf Letter at 2–3.) However, Wolf fails to explain why she never deposed Locascio who was plaintiff's witness at trial. Wolf's counsel asserts that Locascio "never mentioned the job offer" when he spoke with him prior to trial. (Wolf Letter at 2.) Locascio's omission during an informal conversation does not excuse counsel's failure to conduct discovery.

Finally, Wolf asserts that she was hampered by the "limited" discovery schedule imposed by the Court. (*See* Wolf Letter at 1.) However, this Court extended the fact discovery deadline twice at plaintiff's request. (*See* Doc. No. 48 (Memo Endorsement, dated July 16, 1998, granting 45–day extension)); Doc. No. 49 (Memo Endorsement, dated September 24, 1998, granting 60–day extension). Indeed, in plaintiff's second request for an extension of discovery, Wolf sought and received permission to depose Rivera. In contrast, plaintiff did not seek to depose Locascio at that time. The claim that the plaintiff was obstructedˊin conducting discovery from Locascio is contrived and without merit. Accordingly, Wolf's application to renew claims pursuant to Rule 60(b)(2) is denied.

## CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the Clerk of the Court is directed to enter judgment in favor of the defendants BOE, Crew and Kadish dismissing the amended complaint. In addition, plaintiff's motion pursuant to

Rule 60(b)(2) to reopen previously dismissed claims based on new evidence is denied. The Clerk is directed to close this case.

SO ORDERED.